IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:22-CV-145-RP |
| | § | |
| DONGXIN MA and MA ACUPUNCTURE | § | |
| CENTER PC, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Plaintiff United States of America's (the "United States") motion to enforce settlement agreement, or in the alternative, motion for summary judgment. (Dkt. 39). Defendants Dongxin Ma ("Ma") and Ma Acupuncture Center PC (collectively, "Defendants") filed a response in opposition. (Dkt. 42). The United States then filed a reply, (Dkt. 43), and Defendants, with permission of the Court, filed a sur-reply, (Dkt. 50). The Court held an evidentiary hearing on the motion to enforce settlement on January 25, 2024. (Min. Entry, Dkt. 53). Also before the Court is Defendants' motion for leave to file a supplement based on hearing testimony, (Dkt. 59), and the United States' response in opposition, (Dkt. 61). Having considered the briefing, the evidence, the testimony and argumentation at the hearing, and the applicable law, the Court finds that Defendants' motion for leave to file a supplement should be denied and the United States' motion to enforce settlement agreement should be granted.

## I. BACKGROUND

### A. Factual Background of the Case and Settlement Discussions

On February 16, 2022, the United States brought this case under the False Claims Act to recover treble damages and civil penalties from Defendants, an acupuncturist and his clinic. (Compl., Dkt. 1). The United States alleges that Defendants submitted inflated bills to the U.S. Department of

Veterans Affairs for the clinic's acupuncture services. (*Id.*). The United States also asserted common law claims of payment by mistake and unjust enrichment and seeks to recover the amounts it overpaid under those legal theories. (*Id.*). In sum, the United States seeks $3,865,725.03 in treble damages and $19,286,920.80 in civil penalties. (Mot. Enforce, Dkt. 39, at 2).

On September 12, 2023, the United States filed a motion for summary judgment. (Dkt. 35). The following day, on September 13, the parties attended mediation before Patrick Keel, a private mediator in Austin and former state district judge. (Mot. Enforce, Dkt. 39, at 2). On September 19, the United States filed a notice of settlement, informing the Court that the mediation was successful and that the parties had settled the case at mediation. (Not. Settlement, Dkt. 37). The Mediator's Alternative Dispute Resolution Summary, attached to the notice of settlement and signed by the mediator, also stated that the case settled at mediation. (Dkt. 37-1). The United States stated that the parties still had to draft and execute a written settlement agreement and that the United States anticipated that that the parties would finalize the agreement and file a stipulation of dismissal within ninety days. (Not. Settlement, Dkt. 37).

After mediation, the United States reduced the alleged orally mediated settlement agreement to writing ("Written Agreement"). (Dkt. 39-1). The United States represents that the Written Agreement incorporates the terms agreed to at mediation. (Mot. Enforce, Dkt. 39, at 2). The Written Agreement states that, among other things, the parties agreed that Defendants would pay the United States $2.3 million; that Defendants would make an initial payment of $100,000 within 60 days and would pay the remainder (plus interest at a rate of 4.25% per annum) over a period of 42 months; that Defendants would fund the settlement by making commercially reasonable efforts to sell certain real property; that the United States would be entitled to 75% of the proceeds of any such sale (plus accrued interest to the date of the sale); and that the United States would be entitled to place liens on certain real property to secure payment of the settlement amount. (Written Agreement, Dkt. 39-1, ¶

1). The parties agreed that, subject to certain exceptions, the United States would release Defendants from civil claims under the False Claims Act, the Civil Monetary Penalties Law, the Program Fraud Civil Remedies Act, and common law theories of payment mistake, unjust enrichment, and fraud. (*Id.* ¶ 2).

The Written Agreement also includes provisions that the United States refers to as standard terms and conditions (the "Additional Terms") that it states are commonly found in other settlement agreements entered by the United States Department of Justice (the "DOJ"). These Additional Terms include: (1) a reservation of claims and rights by the United States not otherwise covered by the Written Agreement; (2) provisions detailing the consequences of Defendants' failure to provide accurate and complete financial disclosures regarding their financial assets; (3) an agreement by Defendants to not raise certain defenses if the Written Settlement is rescinded; (4) a release by Defendants of claims related to this case against the United States; (5) an agreement regarding "Unallowable Costs" which Defendants cannot recover for government contracting purposes; (6) an agreement by Defendants to waive payment for the health care billings at issue in this case; (7) penalty provisions in the event of Defendants' default; and (8) provisions in the event of Defendants' bankruptcy. (*Id.* ¶¶ 3–7, 9–11).

From September 21 to November 13, 2023, the United States' counsel—Thomas Parnham Jr.—called and emailed Defendants' counsel—Sean Teare and Dan Cogdell[1]—multiple times requesting that the parties finalize the Written Agreement. (*See* Mot. Enforce, Dkt. 39, at 3–4). Most significantly, on October 16, 2023, Parnham left a telephone message with Defendants' counsel and sent them an email, asking if Defendants had any edits or responses to the Written Agreement. (*Id.*; Ex. B, Dkt. 39-2, at 2). On the same day, Teare called Parnham back and stated that Defendants

---

[1] Teare and Cogdell withdrew as counsel of record for Defendants on November 27, 2023. (*See* Mot. Withdraw, Dkt. 40; Text Order dated Nov. 27, 2023).

"had no edits to the draft agreement, and asked for a clean copy of the agreement for signature."
After the call, Parnham sent Defendants' counsel an execution copy of the settlement agreement in
PDF form. (*Id.*; *see also* Ex. B, Dkt. 39-2, at 2). However, Parnham never heard back from
Defendants' counsel, despite a number of efforts to reach them by telephone and email over the
following month. (*Id.*).

## B. Procedural History

On November 18, 2023, the United States filed the present motion, requesting that the
Court enter an order summarily enforcing the parties' settlement agreement and entering final
judgment on its terms. (Mot. Enforce, Dkt. 39). In the alternative, the United States requests that the
Court grant its motion for summary judgment, which was unopposed at the time the motion to
enforce was filed. (*Id.*). Defendants filed a response in opposition to both motions. (Resp., Dkt. 42).
The United States filed a reply brief in support of its motion to enforce settlement, or in the
alternative motion for summary judgment. (Reply, Dkt. 43).

On December 6, 2023, the United States filed a motion for leave to file under seal a copy of
the mediator's term sheet—a handwritten document prepared by the mediator that the United States
alleged reflected the final terms agreed to by the parties at mediation—as an exhibit to its reply brief.
(Mot. Seal, Dkt. 44). The United States requested that the term sheet be filed under seal pursuant to
Local Rule CV-88(f), which states that communications by participants of an alternative dispute
resolution ("ADR") procedure and "[a]ny record made at an ADR procedure" are confidential. (*Id.*).

On December 11, 2023, the Court issued an order setting an evidentiary hearing in this case.
(Dkt. 45). In the order, the Court ordered Judge Keel and Teare to appear at the hearing for
testimony. (*Id.*). On December 13, Defendants filed an opposed motion for leave to file five
documents: a plea of jurisdiction, a FRCP 37 motion to exclude, a motion for judgment on the
pleadings, a motion for summary judgment, and a sur-reply to the motion to enforce. (Mot. Leave,

Dkt. 46). Defendants argued that good cause existed for the Court to allow them to file the four motions because Defendants were not adequately represented by their prior counsel, and had they been properly represented, Defendants would have filed these motions at the appropriate time. (*Id.* at 2). As part of their proposed sur-reply, Defendants also made an objection to the Court's consideration of the Written Settlement, the mediator's term sheet, and Judge Keel's testimony. (Sur-Reply, Dkt. 46-5, at 1–2). Defendants argued that all three pieces of evidence were barred by Local Rule CV-88(f). (*Id.*).

On December 21, 2023, the Court issued an order granting in part Defendants' motion for leave to file, finding good cause for Defendants to file their sur-reply. (Order, Dkt. 49, at 2). The Court stated that it would reserve judgment on Defendants' request to file the other four motions until after it decided the United States' motion to enforce because the issue of counsel representation is relevant to both the motion to enforce the settlement and the motion for leave to file. (*Id.* at 2). In the same order, the Court also addressed Defendants' objections to the Written Agreement, mediator's term sheet, and Judge Keel's testimony. The Court found that the Written Agreement was not barred by Local Rule CV-88(f) because it was not a "communication . . . made by any participant during an ADR procedure" nor a "record made at an ADR procedure." (*Id.*). The Court did, however, sustain Defendants' objections as to the mediator's term sheet and Judge Keel's testimony. (*Id.*). Accordingly, when the Court reset this motion for an evidentiary hearing, it required Teare to attend the hearing but no longer required Judge Keel's attendance. (*See* Order, Dkt. 51).

On January 25, 2024, the Court held a hearing on the motion to enforce. (Minute Entry, Dkt. 53). The Court heard testimony from three witnesses: Defendant Ma, counsel for the United States, Parnham, and former counsel for Defendants, Teare. (*See* Witness List, Dkt. 54). The Court also considered arguments from counsel. On March 27, 2024, Defendants filed a motion for leave to

file a supplement based upon the testimony heard at the hearing. (Dkt. 59). The United States filed a response in opposition to the motion for leave to file a supplement. (Dkt. 61).

## II. MOTION FOR LEAVE TO FILE SUPPLEMENT

The Court begins by briefly addressing Defendants' motion for leave to file a supplement based upon testimony at the hearing. (Dkt. 59). Defendants wish to raise two additional arguments in the proposed supplement: (1) the Written Agreement is distinct from the alleged oral agreement reached at mediation and contains material terms which Defendants never agreed to; and (2) the Written Agreement constituted a counteroffer which voided the alleged oral agreement reached at mediation. (*Id.* at 2). Defendants' motion relies solely on their contention that "[g]ood cause exists" to allow this supplement. (*Id.* at 1). The United States opposes Defendants' motion for leave, arguing that Defendants have already had plenty of opportunities to make these arguments at the hearing and in their prior briefs on the motion to enforce. (Resp. Mot. Leave, Dkt. 61).

The Court agrees with the United States. Defendants have had multiple opportunities to bring additional arguments to the Court's attention. Aside from their initial response brief, the Court granted Defendants leave to file a sur-reply, in which Defendant expanded upon their opposition to the United States' motion to enforce. (*See* Order, Dkt. 49; Sur-Reply, Dkt. 50). Defendants also had an opportunity to argue their case at the evidentiary hearing, at which time they raised the two arguments that are the subject of the proposed supplement. (*See* Hr'g Tr., Dkt. 58, at 106–07). Supplemental briefing is not appropriate when, as here, "the nonmoving party . . . simply wants an opportunity to continue the argument[.]" *Sidbury v. Dun & Bradstreet Emerging Bus. Corp.*, No. 1:19-CV-865-RP, 2020 WL 10758104, at *1 (W.D. Tex. 2020). Accordingly, the Court denies Defendants' motion for leave to file a supplement.

## III. MOTION TO ENFORCE SETTLEMENT

### A. Legal Standard

"[A] district court has inherent power to recognize, encourage, and when necessary enforce settlement agreements reached by the parties." *Wise v. Wilkie*, 955 F.3d 430, 434 (5th Cir. 2020) (quoting *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994)). "Compromises of disputed claims are favored by the courts." *Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 391 (5th Cir. 1984) (quoting *Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33, 35 (5th Cir. 1967)). For that reason, the Fifth Circuit has repeatedly emphasized that "a settlement agreement once entered into cannot be repudiated by either party and will be summarily enforced." *White Farm Equip. Co. v. Kupcho*, 792 F.2d 526, 530 (5th Cir. 1986) (quoting *Cia Anon*, 374 F.2d at 35). Ultimately, "[t]he decision whether to grant a motion to enforce a settlement agreement is committed to the discretion of the district court." *Weaver v. World Fin. Corp. of Tex.*, No. 3:09-CV-1124-G, 2010 WL 1904561, at *2 (N.D. Tex. May 12, 2010) (citing *Deville v. U.S. ex rel. Dep't of Veterans Affs.*, 202 Fed App'x 761, 762 (5th Cir. 2006)). "A district court may exercise its discretion to enforce a settlement agreement where one party to a suit has initially agreed to a settlement but later refused to execute a formal agreement reciting the terms of the settlement." *Id.* However, "when opposition to enforcement of the settlement is based not on the merits of the claim but on a challenge to the validity of the agreement itself, the parties must be allowed an evidentiary hearing on disputed issues of the validity and scope of the agreement." *Mid-S. Towing*, 733 F.2d at 390. In addition, "[w]hen enforcing a settlement, a district court must make findings of fact and draw conclusions of law." *Vikas WSP, Ltd. v. Econ. Mud Prods. Co.*, 23 F.4th 442, 456 (5th Cir. 2022).

Because this is primarily a False Claims Act case, federal contract law governs the validity and enforceability of the purported settlement agreement. *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018); *In re Deepwater Horizon*, 786 F.3d 344, 354 (5th Cir. 2015). But "federal

contract law is largely indistinguishable from general contract principles under state common law," so courts "rely not only on federal cases, but also on treatises and state contract law cases" in their analysis. *Deepwater Horizon*, 786 F.3d at 354.

"A settlement agreement is a contract." *Guidry v. Halliburton Geophysical Servs., Inc.*, 976 F.2d 938, 940 (5th Cir. 1992). A settlement agreement is valid and enforceable if there has been an offer, acceptance, and mutual consideration over essential terms. *Deepwater Horizon*, 786 F.3d at 355–60. "Federal law does not require settlement agreements to be reduced to writing." *E.E.O.C. v. Phillip Servs. Corp.*, 635 F.3d 164, 167 (5th Cir. 2011). "Absent a factual basis rendering it invalid, an oral agreement to settle a [federal] claim is enforceable against a plaintiff who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute." *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981) (per curiam). Thus, a party who "changes his mind when presented with the settlement documents . . . remains bound by the terms of the agreement" as long as the parties previously authorized the settlement agreement. *Id.*; *see also Deepwater Horizon*, 786 F.3d at 357 (explaining that "courts routinely enforce settlement agreements . . . even when one of the parties ultimately fails to sign the finalized release"). For there to be a binding contract, the parties must have agreed to the material or essential terms of the settlement agreement. *See Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012). "Whether a term is material or essential is a legal question that the court examines on a case-by-case basis." *Id.*

In the Fifth Circuit, "an attorney of record is presumed to have authority to compromise and settle litigation of his client." *Quesada v. Napolitano*, 701 F.3d 1080, 1083 (5th Cir. 2012) (quoting *Mid-S. Towing*, 733 F.2d at 390). Thus, "[w]here a party has knowingly and voluntarily agreed to settle his claims and no change of circumstances warrants repudiation of the agreement, the courts will enforce the settlement agreement." *Bell*, 36 F.3d at 449 (quoting *Lyles v. Com. Lovelace*

*Motor Freight, Inc.*, 684 F.2d 501, 504 (7th Cir. 1982)). "One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted." *Mid-S. Towing*, 733 F.2d at 391-92 (quoting *Callen v. Pa. R.R. Co.*, 332 U.S. 625, 630 (1948)).

## B. Discussion

The United States requests that the Court enter an order enforcing the settlement agreement that the parties allegedly entered into at mediation. The United States presents three theories of how the Court could enforce the settlement agreement. The United States' primary argument is that the parties came to an oral agreement at mediation on September 13, 2023; this oral agreement covered the material terms of the settlement agreement; and the Written Agreement that the parties later circulated memorialized this agreement. According to the United States, the material terms agreed to at mediation were: (1) the United States will release certain civil claims against Defendants under the False Claims Act and other federal statutes and common law theories in exchange for payments totaling $2.3 million plus interest over a period of 42 months, with an initial payment of $100,000; and (2) Defendants will satisfy their payment obligations by selling certain real property, with the United States receiving a percentage of the proceeds of those sales and securing payment by placing liens on certain properties. Accordingly, the United States argues that the Court should enforce the entire Written Agreement, even if the parties did not explicitly agree to the Additional terms in the Written Agreement, because the Additional terms are immaterial. (*See* Reply, Dkt. 43, at 4).

Second, in the alternative, the United States argues that if the Court were to find that the Additional Terms are material, then the Court could find that Parnham and Teare's phone conversation on October 16, 2023—in which Teare stated that Defendants had no edits to the Written Agreement—constituted acceptance of the Written Agreement, including the Additional Terms. Thus, the Court could enforce the Written Agreement based on two oral agreements: the

one that occurred at mediation and the one that occurred on the October 16 phone call. (Hr'g Tr., Dkt. 58, at 72–73). Third, the United States requests that, if the Court were to find that the Additional Terms were material but that the October 16 phone call did not constitute an oral agreement to those terms, then the Court enter a final judgment that reflects only the material terms discussed at mediation. (*See* Reply, Dkt. 43, at 4).

In opposition, Defendants argue that neither the oral agreement made at mediation, nor the October 16 phone call constitute binding contracts. Defendants attack the United States' theories regarding the alleged settlement agreements on four fronts. First, Defendants argue that Ma did not give his consent for Teare to settle the case at mediation on the terms that Teare agreed. Second, Defendants contend that the parties did not intend for their oral agreement at mediation to be final and binding. Third, Defendants argue that the Additional Terms in the Written Agreement cannot be enforced because they are material to the settlement agreement and Defendants did not agree to them at mediation nor on the October 16 phone call. (*See* Resp., Dkt. 42, at 1, 4). Fourth, Defendants contend that the Written Agreement constituted a counteroffer that nullified the alleged oral agreement reached at mediation. (*See* Hr'g Tr., Dkt. 58, at 106–07).

1. The Parties Orally Agreed to Settle the Case at Mediation.

The Court begins its analysis by noting the undisputed facts. The two parties mediated on September 13, 2023, before Judge Keel. (Mot. Enforce, Dkt. 39, at 2; Teare Aff., Dkt. 42-2, at 33–34). Each party was represented by counsel: The United States was represented by Parnham and Liane Noble, and Defendants were represented by Teare. (Hr'g Tr., Dkt. 58, at 22, 80). Ma was also present. (*Id.*). The parties went to separate rooms, with the mediator traveling between the rooms to discuss proposed settlement terms with each party. (*Id.* at 24). The parties then came to an agreement on settlement terms. At the end of mediation, everyone met together again in one room and shook hands on their agreement. (*Id.* at 26–28, 63, 80–82). After mediation, the United States

10

filed a notice of settlement, in which it stated that the parties had settled the case at mediation. (Not. Settlement, Dkt. 37). Attached to the notice of settlement was an ADR summary form completed by the mediator that stated that the case settled at mediation. (*See* Dkt. 37-1). In the two months following mediation, Defendants did not file anything on the docket disputing these filings.

At the hearing, Ma, Parnham, and Teare all testified that the agreement at mediation was (1) that Defendants were to pay the United States $2.3 million over a period of 42 months, (2) with an initial payment due of $100,000, (3) in exchange for the United States dismissing this case and releasing the claims it had asserted; (4) that Defendants would satisfy their payment obligations by making commercially reasonable efforts to sell certain real property; and (5) that the United States could place liens on certain properties. (*Id.* at 16–17, 25–27, 33–34, 39–40, 51, 80–81). Parnham also testified that he remembered that the parties had agreed that (1) Defendants would pay 4.25% interest annually on the $2.2 million that would be paid over the 42-month period; and (2) within fourteen days of refinancing or selling any of the specified properties, Defendants would remit 75% of the proceeds, plus accrued interest, to the United States. (*Id.* at 51). Defendants do not dispute that the parties agreed to either of these terms.

Based on the record, the Court finds that the parties entered into an oral agreement to settle this case at mediation on the above terms. *See Chen v. Highland Capital Mgmt., L.P.*, 2012 WL 5935602, at *2 (N.D. Tex. Nov. 27, 2012) ("A binding settlement agreement exists where there is a manifestation of mutual assent, usually in the form of an offer and an acceptance.") (internal quotation marks omitted). The Court now considers each of Defendants' arguments as to why the oral agreement at mediation and the Written Agreement are unenforceable.

### 2. Defendants Consented to the Settlement Agreement.

Defendants argue that they did not personally consent to the oral settlement agreement made at mediation or give their prior counsel authority to consent to the settlement. (Resp., Dkt. 42,

at 1). They allege that Ma only gave Cogdell and Teare authority to settle the case up to $1 million, and that by agreeing to a settlement amount of $2.3 million, Teare exceeded the settlement authority Ma had given him. (*See* Sur-Reply, Dkt. 50, at 3–5). Defendants also argue that Ma expressed his objection to the $2.3 million settlement during the mediation, but that Teare accepted it regardless. (*See id.*). The United States argues that even though Ma did not personally consent to the oral settlement agreement, his attorney of record consented, and his attorney of record is presumed to have authority to settle on his behalf. (Reply, Dkt. 42, at 2–3). The United States also argues that post-mediation emails provided by Defendants demonstrate that Ma only had a change of heart regarding the settlement agreement once his insurance company informed him—after mediation—that they would not cover the settlement payments. (*Id.* at 3–4).

In the Fifth Circuit, "an attorney of record is presumed to have authority to compromise and settle litigation of his client." *Quesada*, 701 F.3d at 1083 (quoting *Mid-S. Towing*, 733 F.2d at 390). Where "the plaintiff is represented throughout the settlement negotiations by her attorney of choice, the settlement agreement is presumptively informed, willing, and valid." *McCardell v. Verizon Wireless Texas, LLC*, No. CIV.A. H-09-1419, 2011 WL 841519, at *2 (S.D. Tex. Mar. 4, 2011); *see also Baptist v. City of Kankakee*, 481 F.3d 485, 488, 490 (7th Cir. 2007). The presumption that an attorney of record has authority to settle litigation on behalf of the client can only be overcome by "affirmative proof . . . that the attorney had no right to consent" to the settlement. *Quesada*, 701 F.3d at 1083.

Here, Teare clearly represented Defendants at the mediation and had general authority to settle the case on their behalf. Defendants entered into evidence the fee agreement that Ma signed, in which he agreed that Cogdell's law firm would represent him in this case. (*See* Fee Agreement, Dkt. 42-2, at 11–16). Teare, an attorney at Cogdell's law firm, thus had authority to represent Ma. (*See* Hr'g Tr., Dkt. 58, at 76–77). Teare represented Ma at his deposition in June 2023, and he again met with Ma prior to mediation to discuss their strategy. (*Id.* at 79). When asked at the hearing if

12

Teare had "any doubt based on the conduct and words of [Ma] that [Teare was] representing him in this matter and [Ma] was consenting to [Teare's] representation," Teare said that he had no doubts. (*Id.* at 99–100). Defendants argue that Ma never personally told anyone at mediation that he agreed to the settlement terms. (*See* Hr'g Tr., Dkt. 58, at 45). However, that is not the standard; Ma was not required to personally agree to the terms of the settlement. As Ma's counsel of record, Teare was presumed to be speaking on his client's behalf. Therefore, Teare's agreement to the settlement terms is all that is needed to bind Ma, unless Ma presents "affirmative proof" that Teare did not have authority to consent to the specific terms in the settlement.

Ma protests that he only gave Teare authority to settle the case at or below $1 million. Ma states that in June 2023, he met twice with Cogdell, who reassured him that Cogdell could settle the case for less than $1.5 million. (Ma Aff., Dkt. 42-2, at 4). At a meeting on September 6, 2023, Ma attests that Teare told him that the most that they would agree to at mediation was $1 million. (*Id.* at 4–5). Ma states that during mediation, "whenever the mediator would leave the room, I would tell Teare that I did not agree with what [Teare] and the mediator had been discussing and that there was no way I could agree to those terms." (*Id.* at 5). However, during the hearing, Ma testified that he never told Teare that he disagreed with the settlement terms, only that the terms were "impossible." (*See* Hr'g Tr., Dkt. 58, at 44–45 ("I told him it's impossible. I don't till him [sic] disagree. I said it's impossible.")).

The Court finds that Defendants have not met their burden in rebutting the presumption that Teare had authority to settle this case under the terms to which he agreed. In cases such as this, where a party seeks to nullify a settlement post-mediation, courts within the Fifth Circuit have considered the dispositive issue to be whether a party's counsel agreed to a settlement despite the party resisting settlement properly objecting to counsel during mediation. *Compare Fields v. SBC Commc'ns, Inc. Disability Income Plan*, No. A-11-CV-1022-AWA, 2014 WL 2765687, at *3 (W.D. Tex.

June 18, 2014) (granting the motion to enforce the settlement agreement where there was no evidence the non-moving party objected during mediation), *with Stuart v. Russell*, No. 3:21-CV-01231, 2023 WL 5487365, at *2 (W.D. La. Aug. 8, 2023), *report and recommendation adopted by* 2023 WL 5486160 (W.D. La. Aug. 23, 2023) (denying the motion to enforce where the Court accepted testimony that counsel was under the mistaken assumption that he had authority to settle the case). Here, the Court finds no evidence that Ma objected to Teare agreeing to the $2.3 million settlement. Teare testified at the hearing that Ma was aware of the settlement terms,[2] Ma did not object to Teare or the mediator about those terms, and Teare believed that he had authority to agree to the settlement terms. (*See* Hr'g Tr., Dkt. 58, at 81–82). Further, Parnham testified that Ma and Teare's actions at the mediation gave him the impression that Teare had authority to settle the case on Defendants' behalf. (*See id.* at 62–64).

Ma's testimony to the contrary does not convince the Court otherwise. The Court does not find Ma's statements that the settlement terms were "impossible" sufficient to constitute a proper objection to the agreement—a client simply stating that settlement terms would be difficult to accomplish is not the same thing as a client telling his attorney that the attorney does not have authority to agree to those terms. To the extent that Ma and Teare's testimony regarding Ma's communications to Teare conflict, the Court finds Teare to be a more credible witness than Ma. During the hearing, Teare gave clear, level-headed testimony about the events at issue, whereas Ma's testimony was ambiguous and at times contradictory. Based on the testimony of all mediation participants, the Court is not persuaded that Teare exceeded his authority in agreeing to the settlement terms.

---

[2] In his affidavit, Ma suggests that his unease with English contributed to his misunderstanding of the settlement terms during mediation. (*See* Ma Aff., Dkt. 42-2, at 5). This argument is not raised in Defendants' response brief or their sur-reply, and Defendants did not discuss this issue at the hearing. Based on Ma's ability to understand and speak English at the hearing, the Court does not find that his English language ability is reason to invalidate the settlement agreement.

Further, emails provided by Defendants suggest that Ma did not immediately repudiate the settlement agreement post-mediation. (*See* Ex. F, Dkt. 42-2, at 32). To the contrary, the emails suggest that Ma only had a change of heart about the settlement only after his "acupuncture insurance company notified [him] hat they [would] not cover" the required payments. (*Id.*). Even then, Ma expressed an intention to sign the agreement after refinancing one of his properties and clarifying the tax consequences of the settlement. (*Id.*). Rather than demonstrate that Ma objected to the settlement, these emails show that Ma was taking steps post-mediation to begin making payments—an action incongruous with the notion that Ma was forced into a settlement that he did not consent to.

As Defendants' counsel of record in this case, Teare had presumptive authority to settle claims on their behalf. Defendants have not provided affirmative proof that Teare lacked authority to agree to the settlement terms. Although Ma may have subjectively wished to settle the case for less, there is no indication that he told Teare not to accept the mediated settlement terms. He also did not object to the mediator, nor did he say anything to the United States to suggest that he did not agree to the settlement agreement. It is well established that contract formation is based on the objective standard of what the parties said and did—not on their subjective state of mind. *Three H Enterprises, L.L.C. v. Advanced Env't Recycling Techs., Inc.*, 256 F. Supp. 2d 568, 578 (W.D. Tex. 2002); *see also Adia Holdings, Inc. v. United States*, 170 Fed. Cl. 296, 300 (2024). Ma and Teare's actions objectively signaled that Defendants agreed to the settlement terms at mediation. Accordingly, the Court finds that Defendants consented to the settlement agreement.

### 3. The Oral Agreement at Mediation is Final and Binding.

Defendants next argue that the oral agreement at mediation is not an enforceable contract because Ma and Teare did not believe that the settlement agreement was final and binding until it was memorialized in writing and signed by all parties. (Resp., Dkt. 42, at 1, 4). In his affidavit, Teare

states that his understanding was that at mediation, the "general parameters were agreed in terms of

the amount and the terms as to time of payment, but the settlement agreement was not finalized."

(Teare Aff., Dkt. 42-2, at 33). He further states that, "It was my understanding that the settlement

would be final when the edits were agreed upon and the final documents were signed by all parties."

(*Id.* at 34). At the hearing, Teare reaffirmed that it was his belief that the agreement would not be

final until the agreement was signed by all parties. (Hr'g Tr., Dkt. 58, at 94–95). The United States

contends that the oral agreement at mediation is a final and binding contract and that the Written

Agreement is simply a memorialization of the prior oral agreement. (Mot. Enforce, Dkt. 39, at 5).

Under federal law, settlement agreements need not be reduced to writing. *Phillip Servs. Corp.*,

635 F.3d at 167.[3] "Absent a factual basis rendering it invalid, an oral agreement to settle a [federal]

claim is enforceable against a plaintiff who knowingly and voluntarily agreed to the terms of the

settlement or authorized his attorney to settle the dispute." *Fulgence*, 662 F.2d at 1209. Parties may

enter into an oral contract even though they are contemplating a formal writing to memorialize their

agreement. *Scaife v. Associated Air Center Inc.*, 100 F.3d 406, 410 (5th Cir. 1996). "The subsequent

writing then becomes merely a 'convenient memorial' of the agreement." *Id.* For the "convenient

memorial" doctrine to apply, however, the factfinder must usually "ascertain whether the parties

intended to be bound by the agreement before the agreement was formally executed." *Id.*

It is clear from the record that the United States intended to be bound by the oral

agreement. Parnham testified that it was his understanding that the agreement at mediation was

binding. This understanding was based on his experience having participated in roughly a dozen

mediations; Parnham's understanding was that if the parties reached an agreement at mediation, that

---

[3] In their response brief, Defendants argue that the oral settlement agreement is unenforceable under Texas law because Texas Rule of Civil Procedure 11 requires that settlement agreements be written and signed by the parties. (Resp., Dkt. 42, at 3–4 (citing Tex. R. Civ. P. 11)). However, because this case arises under the False Claims Act, federal law regarding enforcement of settlement agreements applies to this case, and TRCP 11 is inapposite.

the oral agreement would be a binding contract. (Hr'g Tr., Dkt. 58, at 64–65). Parnham also believed

that the agreement was binding based on the conduct at the mediation in this case. (*Id.*). The parties

shook hands at the end of mediation, signaling their agreement to the terms they had discussed. (*Id.*

at 27–28, 63, 82). Further, the parties never specifically said that their agreement would not be

binding until it was reduced to writing and signed by all parties. (*Id.* at 45–46, 64).

The parties' conduct post-mediation confirms that the parties intended their agreement to be

binding. Once the mediation was complete, the mediator filed an ADR summary, attached to the

United States' notice of settlement, in which he indicated that the parties settled at mediation. (*See*

Dkt. 37-1). The Court credits the fact that Judge Keel is a former state district judge who has

significant experience mediating cases. (*See* Hr'g Tr., at 78). Although Judge Keel did not testify at

the hearing, the Court finds it unlikely that Judge Keel would have signed the ADR summary if he

did not believe that the parties had come to a final settlement agreement. Further, after the ADR

summary was filed on the docket, Defendants' counsel did not file any opposition to the ADR

summary or to the United States' notice of settlement. Nor did Defendants' counsel file a response

to the United States' motion for summary judgment, which was filed the day before mediation

occurred. (*See id.* at 89–90). These actions indicate that Defendants' counsel agreed with Judge Keel

that the case had settled at mediation and, therefore, there was no need to further litigate the

pending motion for summary judgment.

Defendants also contend that certain provisions in the Written Agreement confirm that

execution was required for the settlement to be binding. Defendants rely on provisions such as,

"This agreement constitutes the complete agreement between the Parties," and "This Agreement is

effective on the date of signature of the last signatory to the Agreement." (Sur-Reply, Dkt. 50, at 7

(citing Written Agreement, Dkt. 39-1, ¶¶ 16, 22)). Because the Written Agreement was never

executed, its provisions are irrelevant to the question of whether the parties entered into a binding and valid settlement agreement at mediation.

The Court does not doubt Teare's belief that the agreement would not be final until it was reduced to writing and signed by all parties. However, the Court finds that this belief was mistaken. As mentioned above, contract formation is governed by parties' objective behavior—not their subjective intentions. *Three H Enterprises, L.L.C.*, 256 F. Supp. 2d at 578; *see also Adia Holdings,* 170 Fed. Cl. at 300. Further, "[a] settlement is valid and enforceable even if it contemplates the parties signing a release at a later date unless the parties explicitly provide that a valid contract will not be formed until the parties execute a formal, finalized agreement." *Deepwater Horizon*, 786 F.3d at 356 (cleaned up). The parties' objective conduct at mediation and post-mediation indicates that the parties entered into an enforceable settlement agreement at mediation. Nothing in the record suggests that the parties explicitly provided that their settlement would not be final until the parties executed a finalized written agreement. The Court therefore finds that the parties intended to be bound by the oral agreement they made at mediation.

4. The Written Agreement is Enforceable Because the Additional Terms Are Not Material.

Defendants next contend that even if the parties reached a binding agreement at mediation, the Written Agreement should not be enforced because the Written Agreement contains additional terms that were not discussed nor agreed to at mediation. (*See* Sur-Reply, Dkt. 50, at 6). The United States argues that the parties agreed to the essential terms of the settlement agreement at mediation and that the Additional Terms in the Written Agreement are standard terms and conditions that the DOJ always provides in their agreements. The United States contends that the additional terms can be enforced because they are non-essential terms. (Reply, Dkt. 43, at 4).

As explained above, the Additional Terms at issue include: (1) a reservation of claims and rights by the United States not otherwise covered by the Written Agreement; (2) provisions detailing

the consequences of Defendants' failure to provide accurate and complete financial disclosures

regarding their financial assets; (3) an agreement by Defendants to not raise certain defenses if the

Proposed Settlement is rescinded; (4) a release by Defendants of claims related to this case against

the United States; (5) an agreement regarding "Unallowable Costs" which Defendants cannot

recover for government contracting purposes; (6) an agreement by Defendants to waive payment for

health care billings at issue in this case; (7) penalty provisions in the event of Defendants' default;

and (8) provisions in the event of Defendants' bankruptcy. (Written Agreement, Dkt. 39-1, ¶¶ 3–7,

9–11). It is undisputed that these terms were not discussed in detail at mediation nor agreed to at

mediation. (*See* Hr'g Tr., Dkt. 58, at 37–38, 46, 51–52, 90–94). Instead, after the parties agreed to

the settlement amount and the timing of the settlement payments, Parnham told Teare that he

would send around a written agreement that would incorporate the "standard terms." (*Id.* at 47). In

response, Teare said that he was "familiar" with these terms. (*Id.*).

For there to be a binding contract, the parties must have agreed to the material or essential

terms of the settlement agreement. *See Coe*, 695 F.3d at 320. "Although the parties must agree to all

material terms, they may choose to leave non-essential terms open for later negotiation without

rendering the agreement unenforceable." *Id.* "Whether a term is material or essential is a legal

question that the court examines on a case-by-case basis." *Id.* "Courts generally find there is

agreement on all of the material terms of settlement where the parties have agreed upon the

monetary amount of the settlement payment and the fact that plaintiffs will release specific claims."

*Deepwater Horizon*, 786 F.3d at 357 n.26 (collecting cases). "Agreement on the precise terms of a

written settlement agreement or precise release language is not required." *Id.*

The Court finds that the parties agreed to the material terms of the settlement at mediation

because at mediation, the parties agreed to the amount of the settlement, to the timing of the

payments, how Defendants would make the payments and how the United States would secure

payment, and that the United States would release its claims in exchange for the payments. The Court also finds that the Additional Terms in the Written Agreement are not material terms. The fact that the parties did not discuss the Additional Terms at mediation indicates that the parties did not consider them to be material to the settlement agreement as a whole. *See Lozano v. Metro. Transit Auth. of Harris Cnty.*, No. CV H-14-1297, 2016 WL 3906295, at *9 (S.D. Tex. July 19, 2016) ("[T]erms that arise when formalizing the release agreement that played no part in the parties' actual negotiations cannot be considered material."). Further, at the hearing, Teare himself even admitted that he did not consider any terms in the Written Agreement to be "anything other than standard and customary terms of settlement agreements." (*See* Hr'g Tr., Dkt. 58, at 99).

The evidence shows that the parties agreed to the material terms of the settlement agreement at mediation. "Even where the scope of the release is disputed, courts routinely enforce settlement agreements even where the precise wording of a release has not been finalized." *Deepwater Horizon*, 786 F.3d at 357 (cleaned up). "This remains true even when one of the parties ultimately fails to sign the finalized release." *Id.* That the Written Agreement contains fifteen pages of detailed release terms does not mean that Defendants did not agree to all material terms of the settlement. *See id.* at 358–59 (rejecting plaintiff's argument that it did not agree to all material terms because formal release document was nine pages long and contained detailed release terms). Considering all the evidence, the Court finds that the parties reached a conclusive agreement to settle this case at mediation. Because the Written Agreement contains a memorialization of the parties' oral agreement at mediation and other non-material terms, the Court will enforce the Written Agreement.[4]

---

[4] Because the Court finds that the oral agreement made at meditation is an enforceable contract and that the Additional Terms in the Written Agreement are immaterial to the settlement, the Court does not reach the United States' argument that the October 16, 2023 phone call constituted a separate oral contract.

5. The Written Agreement Was Not a Counteroffer.

Last, Defendants argue that because Parnham testified that the United States may have been agreeable to edits on the Written Agreement post-mediation, the Written Agreement was not a memorialization of the oral agreement at mediation but rather a new set of terms that constituted a counteroffer. (Hr'g Tr., Dkt. 58, at 106–97; *see also id.* at 66–71). Defendants argue that this counteroffer then repudiated any agreement made at mediation. (*Id.*). The Court disagrees.

A "counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." Restatement (Second) of Contracts § 39. "An offeree's power of acceptance is terminated by his making of a counter-offer, unless the offeror has manifested a contrary intention or unless the counter-offer manifests a contrary intention of the offeree." *Id.* Here, the Written Agreement cannot be considered a counteroffer for two reasons. First, the existence of a counteroffer requires that the contract not yet be final. However, the Court has already found that the parties entered into a binding oral agreement at mediation because they agreed on the material terms of the settlement. Even if the parties had not entered a binding agreement at mediation, "[w]hen considering whether a purported acceptance constitutes a counter-offer, the court will find a counter-offer only where there is a 'material variation of the original offered terms.'" *Lozano*, 2016 WL 3906295, at *5 (quoting *E.N. Bisso & Son, Inc. v. World Marine Transp. & Salvage, Inc.*, No. CIV. A. 94-0690, 1996 WL 28520, at *3 (E.D. La. Jan. 23, 1996)). As stated above, the Written Agreement did not contain any material terms that differed than those agreed to at mediation.

There is no evidence in the record that in the weeks following mediation the parties considered the Written Agreement to be a counteroffer that materially changed the agreement made at mediation. To the contrary, the Additional Terms in the Written Agreement were merely non-

essential terms. Accordingly, the Court finds that the Written Agreement was not a counteroffer that repudiated the oral contract entered into at mediation.

## IV. CONCLUSION

The Court is satisfied that the parties entered into an oral contract when they mediated on September 13, 2023. Counsel for both parties agreed to the material terms of the settlement agreement. The United States agreed to release certain civil claims under the False Claims Act and other federal statutes and common law theories against Defendants in exchange for Defendants agreeing to payments totaling $2.3 million plus interest over a period of 42 months, with an initial payment of $100,000. Further, Defendants agreed that they would satisfy their payment obligations by selling certain real property, with the United States receiving a percentage of the proceeds of those sales and securing payment by placing liens on certain properties. These discussions constituted an offer, acceptance, and mutual consideration of the essential terms. The record indicates that Teare consented to the agreement on Defendants' behalf. The evidence also indicates that the parties objectively intended to be bound by this agreement and that the Written Agreement that followed was a memorialization of the oral contract that the parties entered into at mediation. Defendants have not met their burden in proving that this oral contract is invalid or unenforceable.

Only after mediation did Defendants have a change of heart, trying to rescind the settlement agreement by refusing to sign the Written Agreement. However, even if a party "who has previously authorized a settlement changes his mind when presented with the settlement documents, that party remains bound by the terms of the agreement." *Fulgence*, 662 F.2d at 1209. Accordingly, the Court will grant the United States' motion to enforce the settlement and will enter a final judgment consistent with the Written Agreement. *See White Farm Equip.*, 792 F.2d at 530 (affirming judgment that incorporated the terms of the parties' settlement).

For these reasons, **IT IS ORDERED** that Defendants' motion for leave to file a supplement, (Dkt. 59), is **DENIED**.

**IT IS FURTHER ORDERED** that the United States' motion to enforce settlement or in the alternative, motion for summary judgment, (Dkt. 39), is **GRANTED IN PART** as to the motion to enforce the settlement. The United States' motion for summary judgment in the alternative is **MOOT**.

**IT IS FURTHER ORDERED** that the United States' motion for summary judgment, (Dkt. 35), is **MOOT**.

**IT IS FURTHER ORDERED** that Defendants' motion for leave to file a plea of jurisdiction, a FRCP 37 motion to exclude, a motion for judgment on the pleadings, and a motion for summary judgment, (Dkt. 46), is **DENIED**.

**IT IS FINALLY ORDERED** that the United States of America shall recover from Defendants Dongxin Ma and Ma Acupuncture Center PC the sum of $2,300,000.00, according to the terms of the Written Agreement.

The Court will enter final judgment by separate order.

**SIGNED** on July 12, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE